# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR410-160 |
| | ) | |
| HEZEKIAH MURDOCK, et al. | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

Hezekiah Murdock, the lead defendant in this drug conspiracy case, moves to suppress the evidence secured by the government through the use of a wiretap authorized by this Court pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. Doc. 227. The validity of the wiretap is also challenged by co-defendants Alphonso Oliver, who filed a separate motion to suppress, doc. 198, and Jason Harrison, who was allowed to orally adopt Mr. Murdock's motion. Murdock also seeks to suppress evidence seized during the execution of state search warrants for two Savannah

residences. Doc. 228. These motions are without merit and should be **DENIED**.

## I.   The Wiretap

In 2007, Savannah law enforcement officer Michael DeLaTorre, a member of the Counter Narcotics Team ("CNT"),[1] began an investigation that focused upon Hezekiah Murdock, who was suspected of distributing large quantities of marijuana and other drugs in the Savannah area. Over the next two years, CNT agents, Savannah police officers, and Drug Enforcement Administration ("DEA") agents devoted considerable time and resources to this investigation. These law enforcement efforts culminated in the 2010 federal indictment of 32 defendants, 12 in this case and 21 in the companion case of *United States v. Gweh*, No. CR410-159 (S.D. Ga. filed June 10, 2010). Murdock is named in both indictments.

On December 7, 2009, the investigators sought and obtained authorization from this Court to wiretap a cellular telephone utilized by

---

[1]  CNT is a multi-agency task force consisting of members from various local and state law enforcement agencies.

Murdock. Doc. 227-1 at 48. That Order led to the interception of thousands of phone calls, some 5700 of which were determined to be pertinent to the criminal activity under investigation. Murdock seeks to suppress the wiretap evidence on the ground that the government's wiretap application failed to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c).[2] Murdock contends that there was no need for the government to conduct a wiretap of his telephone, as the agents had already "succeeded in accumulating a mountain of alleged evidence against Defendant." Doc. 227 at 2. Murdock further argues that the wiretap evidence should be suppressed because the agents illegally intercepted certain "text messages" not authorized by the wiretap order and because of numerous other "defects and errors" in the affidavit. *Id.* at 3. These arguments do not withstand analysis.

The government's wiretap application was supported by the 47-page affidavit of DEA Agent Michael Sarhatt. Doc. 227-1. That affidavit recounts in detail the two-year history of the investigation of Murdock and some of his key associates. In brief, Agent Sarhatt disclosed that the

---

[2] A judge may not issue a wiretap order unless "the facts submitted by the applicant" demonstrate that conventional investigative techniques have failed or are unlikely to succeed if tried. 18 U.S.C. § 2518(3)(c).

investigators had developed a number of "confidential sources" who had provided overlapping and consistent information that Murdock was a regular distributor of substantial quantities of marijuana and other illicit drugs in the Savannah community.[3]  Through physical surveillence, the agents confirmed that Murdock resided at, or frequented, several homes or apartments described by the informants as stash houses or locations where Murdock negotiated drug deals.  *Id*. ¶¶ 24, 25, 30, 39, 53, 68, 77. The agents also had several informants make recorded or monitored phone calls to either Murdock or one of his associates in an effort to arrange a drug deal.  *Id*. ¶¶ 18, 20, 24, 44, 64, 82.  On one occasion, an informant made a controlled purchase of a pound of marijuana directly from Murdock.  *Id*. ¶ 24.  On four other occasions, another informant dealt with Murdock through a "middle man," who would use the informant's cell phone to call Murdock and arrange delivery of the drugs. *Id*. ¶¶ 45, 52, 54.  This informant made four controlled purchases of small amounts of marijuana ($200-$300 worth) from Murdock's associate.  *Id*.

---

[3] Most of the informants began to cooperate after they were discovered by the agents to be customers of the Murdock organization.  Apparrently, only one of the informants had a history of providing reliable information that had led to the arrest and prosecution of others.  Doc. 227-1 ¶ 57.  However, the seven informants listed in the affidavit were determined to be reliable because of the consistency of the information they provided and by the corroborating evidence gained by the agents during their investigation.

¶¶ 44-45, 50-54, 64-70, 82. Agents were able to surveil Murdock as he traveled to and from the site where some of these drug transactions occurred. *Id*. ¶¶ 45, 53, 68, 82.

Agents developed further information from a reliable informant that one of Murdock's chief suppliers was Joshua Varner, who the informant stated was bringing hundreds of pounds of marijuana to Savannah each month.[4] *Id*. ¶ 58. In May 2009 Varner was a victim of a drive-by shooting while operating a vehicle in Savannah. *Id*. ¶ 46. An off-duty police officer who witnessed the incident had observed someone closely resembling Murdock remove some item from the vehicle before uniformed officers arrived on the scene. *Id*. ¶ 47. Later, a suspected middle man for Varner was shot dead in his home as part of an apparent vendetta between Varner and a rival rapper[5] or drug dealer. *Id*. ¶ 55.

Agents also obtained court authorization to employ pen registers and trap and trace devices on cell phones used by Murdock and other

---

[4] The informant who furnished this information (CS6) had a history of reliability in prior investigations. Doc. 227-1 ¶ 57. In addition, CS6's information was corroborated by another informant (CS7) who admitted to purchasing one-half kilogram of cocaine from Murdock in May 2008. CS7 confirmed that Murdock's source of supply was Joshua Varner and stated that Murdock dealt in 100-pound quantities of marijuana per month. *Id*. ¶ 76.

[5] Both Murdock and Varner were involved in the rap music business. Doc. 227-1 ¶¶ 13, 15, 29, 63, 75, 77.

targets of the investigation. *Id*. ¶¶ 83-91. They determined that Murdock frequently communicated with individuals thought to be involved in the business of distributing drugs and that he often changed cell phones. These cell phone records further reflected that Murdock and an associate listed false subscriber names and addresses with the phone company. *Id*. ¶¶ 88, 90.

Murdock is correct that, using these standard investigative techniques, the agents had amassed considerable evidence that he was engaged in the drug trade. But Agent Sarhatt's affidavit also reflects that these techniques had not been successful in uncovering the full scope of Murdock's own criminal activities, much less in discovering the breadth of the conspiracy, identifying all its members, or obtaining sufficient evidence to secure the conviction of each conspirator. The agents had hard evidence that Murdock was selling marijuana, for they had made several controlled purchases of marijuana from either Murdock or his intermediary. But the agents' investigation gave them good reason to believe that Murdock not only dealt in much larger quantities of marijuana than reflected in the controlled buys, but that he also distributed cocaine and other drugs (such as ecstasy). *Id*. ¶¶ 14, 76.

Despite their extensive investigation, the agents had not gathered convincing proof sufficient to prosecute Murdock and other suspected members of the drug conspiracy for the entire range of their criminal activities.

Agent Sarhatt explained that while the physical surveillance conducted by the investigators had provided useful information, it had not been successful in establishing conclusively the identities or roles of the various conspirators. *Id.* ¶¶ 95-96. The affidavit established that Murdock took countermeasures that made surveillance difficult or impossible at times, *id.* ¶ 34, and the nature of the conspiracy made it unlikely that additional surveillance would add much to the agents' knowledge. Sarhatt further noted that while the agents had developed valuable information from a number of confidential sources, those sources remained "on the fringe of this criminal organization" and could only provide "snap shots" of the conspiracy. *Id.* ¶ 98. Sarhatt's factual recitation supports this assessment, for the informants were merely customers of Murdock or his associates rather than inside men who had detailed knowledge of the activities of the drug organization's key players. Nor had any undercover agent been able to penetrate the

organization's inner sanctum. *Id.* ¶ 100. Finally, Sarhatt convincingly explained that neither the use of search warrants, grand jury subpoenas, interviews of the conspirators, or additional pen register and trap and trace information would uncover the type of evidence needed to shut down the conspiracy and successfully prosecute all of its members. *Id.* ¶¶ 97-103.[6]

The wiretap statute requires that any application for electronic interception contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986) (citing *United States v. Giordano*, 416 U.S. 505 (1974), and *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). The wiretap application "must simply explain the retroactive or prospective failure of several investigative

---

[6] The agents conducted trash pulls from residences utilized by Murdock to conduct drug transactions. *Id.* ¶ 50. Although "residue amounts" of marijuana were recovered, the agents gained no insights as to Murdock's sources of supply, customers, or financial dealings from these trash pulls. *Id.*

techniques that reasonably suggest themselves." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) (quoting *Van Horn*, 789 F.2d at 1496). "However, a comprehensive exhaustion of all possible investigative techniques is not necessary before applying for a wiretap." *Id.* (citing *United States v. Alfonso*, 740 F.2d 862, 868 (11th Cir. 1984)); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978). "The statute was not intended 'to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *De La Cruz Suarez*, 601 F.3d at 1214, (quoting *Alonso*, 740 F.2d at 868).

Murdock insists that the wiretap was unnecessary because the investigators were highly successful in obtaining information against *him*[7] and had already identified most of his coconspirators. Doc. 227 at

---

[7] Murdock repeatedly focuses on the evidence against him alone. For instance, he states that "the investigating agents did not lack for [confidential] sources willing to cooperate with the Government and allegedly purchase narcotics *from Murdock*." Doc. 264 at 5 (emphasis added) Similarly, he notes that "[a]ny contention that physical surveillance allegedly was unsuccessful is refuted by the fact that agents successfully conducted physical surveillance *of Murdock* on numerous occasions," and that surveillance even led to "additional evidence being gathered *against Murdock*." *Id.* at 6 (emphasis added)

17-18.  But the investigation did not target Murdock alone.  Nor had the investigators built an airtight case against Murdock as to all of his suspected criminal activities.  Further, the purpose of the investigation was not simply to *identify* Murdock's coconspirators but to obtain sufficient proof of their guilt to enable their successful prosecution.  Only through the use of a wiretap were the agents able to accomplish these objectives.

Contrary to Murdock's understanding of the law, doc. 264 at 1-2, agents who have developed "mountains" of evidence against one conspirator are nevertheless permitted to use a wiretap to determine the contours and dimensions of the entire conspiracy and to develop sufficient evidence to prove each conspirator's guilt beyond a reasonable doubt.  *E.g.*, *De La Cruz Suarez*, 601 F.3d at 1214 (upholding wiretap where investigators had already uncovered substantial evidence using pen registers, physical surveillance, and five confidential informants; as further surveillance would increase the likelihood of discovery and searches would tip off coconspirators, agents could use wiretaps to "determine the scope of the conspiracy and all of its members"); *United States v. Johnson*, 2010 WL 3447800 at *1 (5th Cir. Sept. 1, 2010) (agents

may use a wiretap to uncover the scope of a conspiracy when "the affidavit gave specific reasons why physical surveillance, trash pulls, and the use of cameras would risk compromising the investigation because of the geographic layout of the area and would be unlikely to provide information about the scope of the operation or [defendant]'s supplier" and further confidential source purchases posed dangers and "would not likely produce information about other members of the operation or [defendant]'s source"); *United States v. Armenta*, 373 F. App'x 685, 688-89 (9th Cir. 2010) (same); *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (same); *United States v. Jackson*, 345 F.3d 638, 644-45 (8th Cir. 2003) (same); *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1365 (S.D. Fla. 2008) ("where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members").

Here, as in the cited cases, the wiretap affidavit refutes defendants' contention that the government failed to establish any "necessity" for the wiretap. The affidavit laid out the history of the investigation and informed the issuing judge of the difficulties involved in using

conventional investigative techniques. While the agents had developed considerable information about the drug organization and of Murdock's role as a key figure in that organization, the agents had not been able to infiltrate the conspiracy at its highest level, identify all of Murdock's coconspirators, or acquire evidence needed to convict each of the conspiracy's members. The district judge had a sound basis for concluding that the government had shown a sufficient "necessity" for the wiretap.

Murdock next argues that the affidavit failed to show probable cause for issuance of a wiretap order. Doc. 227 at 22-24. There is irony here. After initially arguing that the "mountain" of evidence gathered by the investigators was sufficient to prove his guilt beyond a reasonable doubt, doc. 264 at 3-5, Murdock reverses course and suggests that the confidential sources utilized by the government were insufficiently reliable to furnish even reasonable grounds for securing a wiretap order.[8]

---

[8] Murdock makes much of a Second Circuit case, *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), but the facts of that case are quite different from those presented here. In *Lilla*, a police officer had managed a hand-to-hand exchange with a drug dealer but wanted to get a wiretap to nab his cronies. That was the entirety of the investigation. Nevertheless, the officer's wiretap affidavit conclusorily stated that "no other investigative method exists to determine the identity" of individuals involved with the defendant. The *Lilla* court noted that the affidavit was so bad "that the only useful purpose that might be served by the trooper's affidavit . . . is as

Of course, Murdock's probable cause argument is fanciful, for the investigators had not only developed abundant information from various confidential sources that Murdock was a major drug dealer with multiple sources of supply and numerous coconspirators, they had corroborated that information through surveillance, the analysis of phone records, and actual *controlled purchases* of drugs from Murdock and one of his henchmen. Probable cause is not debatable here.[9]

Finally, Murdock claims that the agents engaged in "illegal" interceptions by monitoring certain text messages not contemplated in the wiretap order. Doc. 227 at 2, 21-25. At the hearing on defendant's motion, the government explained that the phone company served with the wiretap order mistakenly relayed these text messages to the monitoring agents, who immediately recognized the error, segregated the

---

an exhibit at a police training academy of how not to conform to the federal and state statutory requirements." *Id.* at 105. Unlike the officer in *Lilla*, the agents in this case conducted a lengthy investigation and employed a variety of investigative techniques in an effort to identify and prosecute each member of the conspiracy. Only when those efforts proved unsuccessful did the agents apply for a wiretap. *Lilla* offers no support for Murdock's argument.

[9] Murdock suggests that Agent Sarhatt made several unsupported allegations in his affidavit, including assertions that Murdock maintained certain residences and utilized hidden compartments in a vehicle. Doc. 227 at 24-25. But even if these "misstatements" are not simple errors but are assumed to have been deliberately or recklessly made by the affiant, the exclusion of the statements would not undermine the probable cause basis for the wiretap order. Thus, they are irrelevant to the analysis.

messages, and never reviewed them. The phone company was then contacted and the messages were stopped. Defendant did not challenge this explanation. Since the government was blameless and Murdock was not prejudiced, there was no government illegality that would warrant suppression of any of the phone intercepts that were lawfully monitored by the agents.

Defendant Oliver raises some additional arguments, but only one merits discussion. He claims, in very cursory fashion, that many of his calls were intercepted but the government never listed him as a target in either the initial wiretap application or any of its extensions.[10] Doc. 198 at 1-2. Title III requires that wiretap applications disclose "the identity

---

[10] Oliver also claims that the wiretap was not (1) necessary, (2) "limited in such a way to respect the notions of the Fourth Amendment," or (3) properly minimized in accordance with the wiretap statute. Doc. 198 at 2. These claims are utterly deficient, as Oliver has not supported his allegations with citations to the record or to any legal authority. Such conclusory allegations violate this Court's local rules. S.D. Ga. L. Crim. R. 12.1. Nor did Oliver attempt to particularize these arguments at the suppression hearing. "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . . A court need not act upon general or conclusory assertions." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). As Oliver's claims are entirely conclusory, they do not deserve consideration. Further, the Court can say with certainty that the necessity requirement, at least, was met for the same reasons it was met as to Murdock. The Court will not, however, scour the record to determine whether every call was properly minimized or conjure up any Fourth Amendment argument on Oliver's behalf.

of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv); *United States v. Donovan*, 429 U.S. 413, 428 (1977) ("A wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone.").

While he does not cite to the record, the Court will, for the sake of present analysis, accept Oliver's assertion that the wiretap orders did not name him but should have. Suppression, however, is not warranted for such violations. The Constitution certainly does not require that every participant in an intercepted communication be named in the wiretap application. *Donovan*, 429 U.S. at 427 n.15 ("It is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named" in the wiretap application); *see United States v. Bannerman*, 2005 WL 2323172 at *3-4 (D. Mass. Aug. 25, 2005). Nor was Title III's suppression provision, 18 U.S.C. §§ 2515 & 2518(10)(a), triggered by a failure to mention Oliver. *Donovan*, 429 U.S. at 435. As the Supreme Court explained in *Donovan*:

If, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization. The intercept order may issue only if the issuing judge determines that the statutory factors are present, and the failure to name additional targets in no way detracts from the sufficiency of those factors.

429 U.S. at 435; *see also United States v. Gonzalez Perez*, 283 F. App'x 716, 722 (11th Cir. 2008) (suppression is not the proper remedy for failure to identify all those likely to be overheard where that information did not play a central role in the decision to authorize surveillance); *United States v. Easterling*, 554 F.2d 195, 196 (5th Cir. 1977) (same).[11] Hence, the orders' failure to list Oliver, standing alone, simply does not warrant suppression here.

Neither Murdock, Oliver, or Harrison[12] has shown any basis for the suppression of evidence secured pursuant to the wiretap order issued by this Court. Accordingly, their challenge to the wiretap interceptions should be **DENIED**.

---

[11] *Easterling* is binding Eleventh Circuit authority. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981).

[12] As Murdock's wiretap challenge fails, so does defendant Jason Harrison's, for he simply adopted Murdock's motion without any additional argument.

## II. The Search Warrants

Murdock seeks to suppress all evidence seized from two Savannah residences -- 101 Rose Dhu Way and Apartment E-4 at the Dutchtown Villas Apartments -- pursuant to search warrants issued by a local superior court judge on May 11, 2010. Doc. 228. Murdock contends (1) that there was no probable cause to search either residence, (2) the warrant for the Dutchtown Road apartment listed the wrong street address and therefore failed to meet the Fourth Amendment's particularity requirement, and (3) both warrants were overbroad in giving agents "unbridled authority" to seize items for which there was no conceivable probable cause. *Id*. The probable cause and overbreadth arguments are patently meritless. The particularity contention raises a more serious claim that required an evidentiary hearing. That claim, too, ultimately fails.

### A. Probable Cause

The Court has already referenced the "mountain of evidence" (to use Murdock's term) that the agents had acquired against Murdock using traditional investigative techniques. But by the time agents sought

search warrants for Murdock's residence and his mother's home on May 10, 2010, they had the benefit of thousands of incriminating telephone conversations monitored pursuant to the wiretap orders issued by this Court. Those intercepted conversations established conclusively that Murdock was a central figure in "a large scale marijuana distribution organization operating in California and Georgia." *Id*. at 22. Through these phone taps, the agents had confirmed that Murdock had a California drug supplier, learned that a large shipment of marijuana was delivered to Savannah on April 27, 2010 (and that Murdock had participated in the off-loading, storage, and distribution of that marijuana load), and discovered that a new marijuana shipment was expected during early May. *Id*. at 22-23.[13]

So, by the time the agents sought search warrants, they had an even larger mountain of evidence that Murdock was a major distributor of drugs in the Savannah community. Murdock nevertheless argues that

---

[13] Using the intercepts, agents had also been able to interdict some of the cash proceeds of Murdock's marijuana sales by conducting traffic stops of one of his couriers in December 2009 and January 2010, seizing some $50,000 in the process. Doc. 228 at 23. They had also seized 20 pounds of marijuana that the courier had abandoned upon arriving at a Savannah bus station in February 2010. *Id*.

probable cause was lacking as to the two properties for which the agents applied for search warrants. In this he is mistaken.

### 1. 101 Rose Dhu Way

Agent DeLaTorre sought authorization to search 101 Rose Dhu Way, a single family dwelling identified in his affidavit as the residence of Murdock's mother, Florence Murdock.[14] *Id*. at 29-30. His affidavit pointed out that while Murdock had maintained four different residences since 2009, he continued to frequent 101 Rose Dhu Way "before and after drug transactions." *Id*. at 29. The affidavit further noted that on January 20, 2010, agents had intercepted a phone call to Murdock from his sister regarding whether she should recover some money for him from his bedroom at the residence. *Id*. at 25. Murdock then gave her specific directions on where to find the money, told her to take the "littlest one" from a bag, and directed her to deliver the money to Jeremy Harris. *Id*. at 26. Elsewhere, the affidavit identified Harris as a drug distributor, *id*. at 22, 27, quoted phone conversations between Murdock

---

[14] For reasons not expressed, the government did not challenge Murdock's "standing" to contest the search of his mother's home, even though the government never lists this property as one of Murdock's residences. As the matter was not raised at the evidentiary hearing, the Court will assume that Murdock had a legitimate expectation of privacy sufficient to contest the search of the property.

and Harris regarding an anticipated drug deal, *id*. at 25, and referenced another intercept regarding a drug deal that Murdock and Harris consummated. *Id*. at 30. So, the affidavit offered good reason to believe that the money Murdock's sister recovered at 101 Rose Dhu Way and delivered to Harris was drug related.

On April 2, 2010, agents intercepted a phone call to Murdock from his mother. She informed Murdock of her intention of having someone clean the backyard of her residence and asked Murdock this question: "you don't have nothing that need to you know in the backyard?" *Id*. at 30. From this statement the agents drew the inference that Florence Murdock was endeavoring to determine whether her son had drugs stored in the backyard before allowing a yard man access to the area. *Id*. In light of all the other evidence available to the agents, this was a reasonable inference.

The task of a court reviewing the validity of a search warrant is not to make a *de novo* determination of probable cause but rather to evaluate whether the issuing magistrate had a substantial basis for finding probable cause. *Massachusetts v. Upton*, 466 U.S. 727, 722-23 (1984); *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Clearly, the affidavit

furnished the state judge with sufficient information to support a finding of probable cause as to the Rose Dhu Way property.

### 2. Dutchtown Villas Apartment E-4

The affidavit offered an even stronger probable cause basis for the search of Murdock's residence at the Dutchtown Villas Apartments. Through surveillance and intercepted phone calls, agents had determined both that Murdock frequently changed his place of residence and that he routinely stored drugs and money at his residence. Doc. 228 at 29. The affidavit noted (as did the wiretap application) that during April and May 2009 agents made controlled purchases of drugs from Murdock and, on two occasions, surveilled him leave his residence (then located at 68 Brown Pelican Drive in Savannah), drive directly to the site of the drug deal, and deliver the drugs. *Id.* at 29. After surveillance established that Murdock had moved into Apartment E-4 at Dutchtown Villas Apartments, agents monitored phone calls between Murdock and Jeremy Harris regarding a suspected drug deal. On April 28, 2010, Murdock left his apartment and, following Harris's rather cryptic directions, traveled to 1000 Ford's Point Circle, which he entered momentarily before driving directly back to his apartment. Murdock

carried a large package inside, then exited and drove his vehicle to a gas station, where he discarded a box into a dumpster. Agents recovered the box and found that it contained a green leafy substance believed to be marijuana. *Id.* at 30. Afterwards, agents observed Murdock leave his apartment, place something in his vehicle, and drive to a local mall. During that trip, agents monitored a phone call between Murdock and one of his main distributors regarding the delivery of several pounds of marijuana. *Id.* at 31. After meeting the distributor at the mall and completing the apparent drug deal, agents observed Murdock put a package in the trunk of his vehicle and return to his apartment. *Id.* at 31.

Presented with this evidence, the state judge had a substantial basis for finding that probable cause existed to search Murdock's apartment.

## B. Particularity

After determining that Murdock had moved into Apartment E-4 at the Dutchtown Villas Apartments and was operating his drug business from there, Agent DeLaTorre applied for a warrant to search those premises. The warrant described the place to be searched as follows:

> 1045 Dutchtown Road apartment E-4, Savannah, Georgia. The residence is a single family apartment and is the bottom right apartment in building E. Apartment #E-4 is affixed to the front door.

Doc. 228 at 21 (application for search warrant), 35 (search warrant). In fact, it is undisputed that the correct address for the Dutchtown Villas Apartments is *1036*, not 1045, Dutchtown Road. It is further undisputed that 1045 Dutchtown Road is the address of a house located directly across the street from the apartment complex.

Agent DeLaTorre testified that although he had conducted surveillance of Murdock's apartment on numerous occasions and had actually resided at Dutchtown Villas Apartments in the past, he was unfamiliar with the apartment complex's street address and had difficulty locating the address prior to applying for the search warrant.[15] Consulting with another police officer who regularly patrolled this area,

---

[15] DeLaTorre stated that he conducted surveillance directly across the street from the apartment complex, parking his vehicle in front of a residence that, it now turns out, bears the address of 1045 Dutchtown Road. DeLaTorre did not recall seeing any sign reflecting the street address for the apartment complex, nor did he pay any attention to the address of the residence located across the street from that complex. Defendant has since produced photos of both a sign reflecting a "1036" address for the apartment complex and a mailbox marked "1045" located in front of the across-the-street residence. He offered no evidence or testimony, however, that those signs were in place in May 2010 when the search warrant was issued. Nevertheless, the Court will assume that the signs were present at that time and were simply overlooked by the officer.

DeLaTorre was informed that the proper street address for the apartment complex was "1045" Dutchtown Road. DeLaTorre then relied on this information in preparing his search warrant application.

The Constitution is quite clear in its command that no warrants shall issue except those "particularly describing the place to be searched and the person or things to be seized." U.S. Const. amend. IV; *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986). "The manifest purpose of this particularity requirement was to prevent general searches." *Garrison*, 480 U.S. at 84. A warrant that lacks a sufficiently particular description of the place to be searched or the property to be seized is invalid, and evidence seized pursuant to such a warrant is subject to suppression.[16] But the Fourth Amendment does not require that a search warrant be "'technically accurate in every detail,'" *United States v. Prout*, 526 F.2d 380, 387 (5th Cir. 1976) (citation omitted), or achieve "the specificity sought by conveyancers." *United States v. Burke*, 784 F.2d at 1092; *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985). Accordingly, an error

---

[16] "Even if a warrant is invalid, law enforcement's good-faith reliance on it may prevent the application of the exclusionary rule." *United States v. Schwinn*, 376 F. App'x 974, 980 n. 5 (11th Cir. 2010) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

in the description of the place to be searched does not necessarily invalidate a warrant and subsequent search. *Burke*, 784 F.2d at 1092; *Weinstein*, 762 F.2d at 1532. Generally, a search warrant satisfies the Fourth Amendment if it describes the premises in such a way that the executing officer may "with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *Burke*, 784 F.2d at 1092; *Weinstein*, 762 F.2d at 1532. A court considering a particularity challenge should also inquire as to whether there is any reasonable probability that another premises might be mistakenly searched. *Prout*, 526 F.2d at 387-88; *United States v. Avarello*, 595 F.2d 1339, 1334 (5th Cir. 1979); 2 Wayne R. LaFave, Search and Seizure § 4.5 at 562 (4th ed. 2004). (the particularity requirement is designed "to minimize the risk that officers executing search warrants will by mistake search a place other than the place intended by the magistrate."). If the warrant, despite its deficiencies, is sufficient to identify the correct property, it satisfies the Constitution.

Numerous cases have held that an error in the street address[17] or apartment number of the premises to be searched does not offend the particularity requirement provided the warrant's physical description of the premises is otherwise sufficient to direct the searchers to the correct house or apartment. In *United States v. Burke*, 784 F.2d 1090 (11th Cir. 1986), the warrant authorized a search of premises located at "38 Throop Street, being a two-story red brick building, trimmed in a reddish-brown paint with a shingled roof and three adjacent apartments, with Apartment 840 being the far left apartment . . . ." *Id*. at 1092. In fact, the defendant resided at *48 Troup Street*, apartment 840. The Eleventh Circuit noted, *inter alia*, that there is no "Throop" Street in Atlanta and that Troup Street is the only street bearing a similar name. Although no residence on Troup Street was numbered "38," the "detailed physical description of the building . . . minimiz[ed] the possibility that an apartment in any bulding other than the correct one would be

---

[17] Identifying the place to be searched by its street address is sufficient but not always necessary to satisfy the particularity requirement. Professor LaFave gives this example: "a warrant to search apartment 8-B in the Colonial Terrace Apartment in a certain community is sufficient without a street address, in the absence of any showing that there is more than one apartment complex with that name in the city." 2 LaFave, Search and Seizure § 4.5(a) at 564 (citing *Tomblin v. State*, 128 Ga. App. 823, 198 S.E.2d 366 (1973)).

searched."[18] *Id*. at 1092. Similarly, in *United States v. Darensbourg*, 520 F.2d 985 (5th Cir. 1975), the warrant authorized the search of "Apartment #70, located at 3101 Highland Rd., in the City of Baton Rouge." In fact, the defendant's apartment was located on July Street, not 3101 Highland Road, which was the address of the business office of the large apartment complex containing some 450 apartments. Since defendant's apartment was the only one within the complex numbered 70, the court found "little likelihood that the wrong premises would be searched -- as indeed they were not." *Id*. at 988.[19]

In this case, despite the erroneous street address, the detailed physical of the premises left no doubt as to the place intended to be

---

[18] Before applying for the warrant, the agent accompanied the confidential informant to the defendant's apartment complex and had the defendant point out the building and apartment where defendant resided. The *Burke* opinion does not discuss why the agent failed to notice that the defendant lived at 48 Troup Street rather than "38 Throop Street."

[19] Many other cases have held that an address error will not invalidate a search warrant where the detailed physical description of the premises makes clear which premises are intended. *See, e.g.*, *United States v. Turner*, 770 F.2d 1508 (9th Cir. 1985) (erroneous street number did not invalidate the search where the warrant described the house with great particularity, no nearby house met this detailed description, the address was reasonable for the location intended, the house had been under surveillance, the executing officer personally knew which premises were intended, and the correct house was searched); *United States v. Figueroa*, 720 F.2d 1239, 1243 n. 5 (11th Cir. 1983) (erroneous address "inconsequential in light of a clear description of the name of the building and its physical appearance"); *United States v. Melancon*, 462 F.2d 82 (5th Cir. 1972) (an error in the rural box number not fatal where the warrant provided a detailed physical description which accurately described the residence to be searched).

searched. The search warrant authorized the search of "Dutchtown Road apartment E-4," described the residence as "a single family apartment," noted that it was the "the bottom right apartment in building E," and stated that "Apartment #E-4 is affixed to the front door." Doc. 228 at 35. It is undisputed that the property located at 1045 Dutchtown Road is a small house, not part of an apartment complex. There is no "building E" on the property, and the term "bottom right apartment" has no conceivable application to this house. Nor is there any "E-4" affixed to the front door of the 1045 residence. Any reasonable agent executing the search warrant would immediately recognize that the freestanding residence located at 1045 Dutchtown Road did not fit the physical description of the premises named in the warrant. Further, it is undisputed that directly across the street from the 1045 address was an apartment complex containing a "building E" and an "Apartment E-4," just as described in the warrant. This was the only apartment complex on Dutchtown Road. Under these circumstances, there was little or no possibility that an executing officer -- even one unfamiliar with the history of the investigation and the location of Murdock's apartment -- would search the wrong premises.

But there is an even stronger ground for finding that the particularity requirement was not violated in this case. The agent in charge of the search team that executed the warrant for Apartment E-4 knew precisely which premises were to be searched. Agent LaTosha Jones testified that she had worked in the wiretap monitoring room and was well familiar with the Murdock investigation. Although she had not conducted surveillance of Murdock's apartment, she had been carefully briefed in advance of the search by Agent DeLaTorre, who informed her that Murdock's apartment was in the Dutchtown Villas Apartments located adjacent to the Savannah Commons Retirement Community and across the street from the Islamic Center. Agent Jones familiarized herself with the search warrant affidavit and reviewed a color photograph of Murdock's apartment building. She testified that given her detailed knowledge of the apartment to be searched, she did not even bother looking for street numbers, for she knew exactly where she was going. Upon arriving at the apartment complex, she led the search team to the bottom right apartment in building E, which was marked "E-4" just as described in the warrant. Murdock was inside the apartment at the time of entry.

It is well settled that an officer's personal knowledge of the place to be searched is a significant factor which may be considered by a court in reviewing a particularity challenge. *Burke*, 784 F.2d at 1093; *Weinstein*, 762 F.2d at 1532-33. This is true "even where such knowledge was not reflected in the warrant or the affidavit supporting the warrant." *Burke*, 784 F.2d at 1093; *see* 2 LaFave, Search and Seizure § 4.5(a). I find that under the particular facts of this case the erroneous street address reflected on the face of the warrant did not invalidate the warrant or require suppression of the evidence seized by the agents from Murdock's apartment. Given the warrant's detailed physical description of the premises to be searched, no reasonable officer would have entered the residence located at 1045 Dutchtown Road, for that house failed to fit the description of the property to be searched as to any particular. Moreover, present at the scene of the search was an agent who had read the affidavit in its entirety, had been briefed by the case agent who served as the affiant for the warrant, and had reviewed a photograph of Murdock's apartment. There was simply no possibility that the executing officers would enter any property other than the specific

apartment for which the issuing magistrate had found probable cause to search.

Despite the address error, this warrant was sufficiently particular to direct the executing officers to Murdock's apartment. His particularity challenge must be rejected.

## C. Overbreadth

Finally, Murdock argues that the search warrant was overbroad and unparticularized as to the items to be seized. Doc. 228 at 10-14. He suggests that the warrant's "sweeping description of property to be searched for . . . and seized" made it defective on its face. *Id.* at 10. He further contends that the warrant's "wildly cast net" furnished the agents with "unbridled authority" to seize documents and other items not connected to the affidavit's probable cause showing. *Id.* at 13.

Murdock is correct that the search warrant authorized the agents to seize a broad range of items, including (1) controlled substances, drug paraphernalia, scales and mixing devices, and packaging materials, (2) books, records, and data stored on computers, cell phones, and other electronic devices reflecting drug sales and/or the use and ownership of the premises being searched, rental storage units, and safe deposit boxes,

(3) photographs or other images (in whatever form) depicting displays of wealth or persons involved in criminal activity, (4) currency constituting the proceeds of drug activity, and (5) firearms and other weapons. *Id.* at 36.[20] Murdock, however, makes no effort to explain how this

---

[20] Specifically, the warrant authorized the search and seizure of:

All controlled substances, controlled substances paraphernalia, scales and mixing devices, packaging materials, all equipment, devices, records, computers and computer storage discs, to include the seizure of computers to retrieve such records, books or documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances, or recording transactions involving controlled substances, PDA's, cell phones, pagers, other electronic devices capable of recording information pertinent to drug sales/use any indicia ownership, photos, and mail showing the existence of rental storage units/keys, safety deposit boxes/keys, bank accounts and safes, dominion, or control over the premises to be searched including rental receipts, mortgage payments, utility bills, photographs, images (either electronic and/or printed and/or developed and/or undeveloped) of any persons involved in the criminal conduct, all financial records pertaining to the disposition of the proceeds of the violation of the criminal laws specified above, and all of the above records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette, or on memory storage devices such as optical disks programmable instruments such was telephones, voice mail, answering machines, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records, and any goods or personal property, including US currency or negotiable instruments, constituting proceeds of a violation of the aforesaid laws or funds used to facilitate the same, firearms, including handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons, and any evidence or items which would be used to conceal the forgoing or prevent its discovery. Also documents with names or addresses indicating ownership or occupation of the residents.

Doc. 228 at 36.

comprehensive list of items to be seized violated the Fourth Amendment's particularity requirement. Murdock correctly notes that the particularity provision requires "'that the warrant must clearly state what is sought.'" *Id.* at 11; U.S. Const. amend. IV (a warrant must "particularly describ[e] the . . . items to be seized"). Although the warrant specifies an extensive list of items to be searched for, Murdock never explains how this list lacks particularity. His argument must be rejected.

Nor does Murdock demonstrate that there was no probable cause to search for the listed items. While it is true that most of the items specified in the warrant had not previously been observed by the agents going into or out of the residence, the law does not require such direct observation in every case.[21] Where the government is seeking to search the residence of one of the principal figures in a drug enterprise, the courts have frequently upheld warrants authorizing a search for a generic class of items common to the drug trade, such as "drug trafficking paraphernalia, records, money, and other evidence of drug

---

[21] The agents had surveilled Murdock leaving the residence with suspected marijuana and had observed him return to the residence with the suspected proceeds of marijuana sales. Doc. 228 at 30-31. So, there was direct observation to this extent.

trafficking." *United States v. Morisse*, 660 F.2d 132, 136 (5th Cir. 1981); *see also United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990) ("The type of criminal activity under investigation in the present case -- a drug dealing business -- makes it difficult to list with any greater particularity the books and records described to be seized which evidences such activity.").

Here, the government established probable cause to believe that Murdock was heavily involved in the drug trade and that he stored large quantities of marijuana, as well as the proceeds of his marijuana sales, at his residence. Although the agents had not actually seen all of the items described in the warrant, these items constitute either the common tools of the drug trade or the types of records customarily kept by those in the business of distributing drugs. It was therefore reasonable for the issuing magistrate to infer that items of this nature would likely be found in the residence. "The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." *Andresen v. Maryland*, 427 U.S. 463, 481 n. 10 (1976).

While Murdock argues that the warrant gave the agents "unbridled authority" to seize items for which there was no probable cause, he never explains how any of the listed items were outside the bounds of the warrant affidavit's probable cause showing. He does, however, contend that the agents seized certain documents -- specified only as "church documents of Mrs. Florence Murdock" -- that "were patently outside the scope of the warrant's and/or the probable cause used to secure them." Doc. 228 at 13. When the items sought by a search are numerous and varied, it is not uncommon for agents to mistakenly seize records that are beyond the scope of the warrant. "Courts have consistently held, however, that absent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect the admissibility of items properly seized." *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982). Even assuming that the "church documents" seized by the agents fell outside the scope of the warrant, Murdock has failed to establish that the agents "flagrantly" exceeded its scope. Further, if the agents did exceed their authority in seizing the church documents, then the appropriate remedy is exclusion of these

particular documents, not the invalidation of the entire warrant. *Id*. at 1354.

## III.  CONCLUSION

For the above stated reasons, defendants' motions to suppress should be **DENIED.**

**SO REPORTED AND RECOMMENDED** this <u>17th</u> day of December, 2010.

_____
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT of GEORGIA**